UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERALD MEINKE, )
)
      Plaintiff, )
)
    v. )    **No: 05 C 3952**
)    **Judge John W. Darrah**
VHS GENESIS LABS, INC., )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gerald Meinke, brought a four-count Complaint against Defendant, VHS

Genesis Labs, Inc. Count I alleged sex discrimination in violation of 42 U.S.C. § 2000e; Count

II alleged retaliation; Count III alleged violations of the Family Medical Leave Act ("FMLA");

Count IV alleged breach of contract; and Count V alleged *quantum meruit* and unjust

enrichment. Currently pending is Defendant VHS Genesis Labs, Inc.'s Motion for Summary

Judgment.

## FACTS[1]

Defendant VHS Genesis Labs, Inc. ("Genesis") operates a medical testing facility in

Berwyn, Illinois, (Def.'s 56.1 at ¶ 4) where Plaintiff, Gerald Meinke, was employed as a sales

---

[1] Genesis moved to strike portions of Plaintiff's response to Genesis' statement of material facts, statement of additional facts, and the affidavits offered in support thereof. Specifically, Genesis asserts that Plaintiff: (1) failed to comply with Local Rule 56.1(b)(3)'s requirement that he list and identify each material fact in a separate section; (2) failed to properly cite record evidence; and (3) failed to comply with the Local Rule because the affidavits submitted by Plaintiff contain inadmissible hearsay, are unsupported by the facts, and/or lack proper foundation. To the extent Plaintiff's statements and responses violate Local Rule 56.1, they have been disregarded.

1

representative. (Def.'s 56.1 at ¶ 6). As a sales representative, Plaintiff's job was to solicit business from doctors and hospitals to send laboratory specimens to Genesis for analysis, to service existing clients by attempting to resolve billing errors, to ensure the overall satisfaction with Genesis' laboratory services, and to assist Genesis in collection of any accounts that were past due over 90 days. (Def.'s 56.1 at ¶ 7-9; Pl.'s 56.1(b)(3)(B) at ¶ 81). Plaintiff worked primarily in the field and from an office in his home; Plaintiff did not have an office at Genesis. (Pl.'s 56.1(b)(3)(B) at ¶ 82). In the four years that Plaintiff worked for Genesis, he always received positive reviews from Genesis and positive reviews from customers. (Pl.'s 56.1(b)(3)(B) at ¶ 83).

In approximately October 2003, Kimberly Graddy ("Graddy") became Plaintiff's supervisor. (Def.'s 56.1 at ¶ 10). Graddy was based on Genesis' office in Indianapolis, Indiana, and managed Plaintiff from afar, only occasionally visiting the Berwyn office. (Def.'s 56.1 at ¶ 11). In the four years that Plaintiff worked for Genesis, the Illinois sales manager position was always held by female employees: first, Margaret Wrenn, then Ashley McDonald, and then Graddy.

Genesis paid Plaintiff a base salary and commission for his work. (Def.'s 56.1 at ¶ 12). Genesis also reimbursed him for telephone and other expenses. (Def.'s 56.1 at ¶ 12). Plaintiff received commissions on the volume of client billings, calculated at the rate of 7 percent for any client billings over $10,000, 5 percent for client billings over $5,000 but under $10,000, and 3 percent for client billings under $5,000. (Def.'s 56.1 at ¶ 12). Under Genesis' commission plan, Plaintiff's commission payments were affected when one of his customers owed money to Genesis for over ninety days. (Def.'s 56.1 at ¶ 13). An exception to this general

2

rule allowed Plaintiff to submit a written request to receive commission payments on client accounts that were over ninety days past due where Plaintiff showed he was making attempts to find out why his client statements were over ninety days overdue. (Def.'s 56.1 at ¶ 14). Beginning in January or February 2004, Genesis denied Plaintiff's written requests for commission payments on client accounts that were over ninety days past due; and Graddy communicated to Plaintiff via email or verbally that he would not receive commission payments on such accounts. (Def.'s 56.1 at ¶ 15-16).

On March 8, 2004, Graddy scheduled a conference call with the entire Genesis sales team (including Plaintiff) to discuss Genesis' conversion to a new information technology system called "Misys." (Def.'s 56.1 at ¶ 17). The conversion to Misys was to "go live" on March 15, 2004. (Def.'s 56.1 at ¶ 17). Graddy instructed Plaintiff and other salespersons to be in the office on March 16 and March 17, 2004. (Def.'s 56.1 at ¶ 17). Graddy also told Plaintiff that he needed to be on the premises in Genesis' Berwyn office on March 15, 2004, in case there were any issues with the Misys conversion. (Def.'s 56.1 at ¶ 18). Graddy said that she needed to have all sales representatives and "all hands on deck" in the Berwyn office. (Def.'s 56.1 at ¶ 18).

During the week of March 15, the implementation of the new laboratory system caused significant confusion because the data entry portion of the software was much slower than Genesis' previous system and Genesis had trouble inputting laboratory orders in a timely manner, which caused hundreds of samples to lose their viability. (Def.'s 56.1 at ¶ 19). The confusion impacted processing of tests from Plaintiff's customers: tests and test results were delayed or were incorrect, and the laboratory lost specimens. (Def.'s 56.1 at ¶ 19). The delays

3

resulted in backups in the processing of information about patients. (Def.'s 56.1 at ¶ 19). Graddy instructed the Plaintiff to field telephone calls from clients and tell them that the test results were delayed. (Def.'s 56.1 at ¶ 20).

On March 17, 2004, Graddy directed Plaintiff to report to Genesis' Berwyn office on March 18 and March 19, 2004. (Def.'s 56.1 at ¶ 22). Plaintiff denies that he was aware of this direction. (Pl.'s Resp. to Def.'s 56.1 at ¶ 22).

Plaintiff did not report to Genesis' Berwyn office on March 18, 2004. (Def.'s 56.1 at ¶ 23). Graddy called Plaintiff on his cellular phone on March 18, 2004, at approximately 1:30 p.m., and told Plaintiff to turn off the NCAA basketball tournament. (Def.'s 56.1 at ¶ 23). Plaintiff denied that he was watching the NCAA tournament at the time. (Pl's 56.1 at ¶ 98). On March 18, Graddy sent Plaintiff an email to his work and home email addresses, threatening disciplinary action up to and including termination if Plaintiff failed to appear at Genesis' Berwyn office to work on March 19 at 8:00 a.m. (Def.'s 56.1 at ¶ 24). Plaintiff did not show up in the Berwyn office on March 19, 2004. (Def.'s 56.1 at ¶ 24). At or about this time, Graddy told Plaintiff that his absences were causing service problems for other members of Genesis. (Def.'s 56.1 at ¶ 25).

On March 19, 2004, Plaintiff left a voicemail for Graddy, requesting permission for a vacation beginning on March 22, 2004. (Def.'s 56.1 at ¶ 26). Later that day, Graddy sent Plaintiff a letter, requesting that he participate in a meeting at the human resources department on March 23, 2004, at 3:30 p.m. (Def.'s 56.1 at ¶ 26). In that letter, Graddy denied Plaintiff's vacation request. (Def.'s 56.1 at ¶ 26). On March 23, 2004, Plaintiff met with Pam Fletcher, a

4

Genesis employee who worked in the human resources department, at her Berwyn office at 3:30 p.m.; Graddy participated by phone. (Def.'s 56.1 at ¶ 27). At the meeting, Fletcher gave Plaintiff a performance counseling notice, which Plaintiff refused to sign. (Def.'s 56.1 at ¶ 27).

On March 24, 2004, at 1:30 p.m., Plaintiff sent Employee Relations Manager Carmen Weathington an email, stating that "due to health concerns [he could] not continue to work for Ms. Graddy" and that he sought "HR's intervention as to how to proceed in this matter." (Def.'s 56.1 at ¶ 28). Approximately three hours later, Weathington responded to Plaintiff's email, encouraging Plaintiff to look after his health first. (Def.'s 56.1 at ¶ 29). Weathington also encouraged Plaintiff to seek a leave of absence from Nora Fong, the Leave Coordinator, or to request a leave of absence from Graddy. (Def.'s 56.1 at ¶ 29). Plaintiff did not fill out a written request for family medical leave in March 2004. (Def.'s 56.1 at ¶ 30).

On March 25, 2004, at 5:12 p.m., Plaintiff sent Graddy an email, requesting that Graddy allow him to go on vacation during the weeks of March 29, 2004 and April 5, 2004. (Def.'s 56.1 at ¶ 32). Plaintiff stated that his wife had booked a birthday vacation for him and that his children were on Spring break. (Def.'s 56.1 at ¶ 32). At 5:20 p.m., Graddy responded to Plaintiff's vacation request by email, informing Plaintiff that his second vacation request was denied due to the operational issues facing Genesis in light of the technology conversion. (Def.'s 56.1 at ¶ 34). The email also stated that "beginning on March 26, 2004, you will be expected to report into the laboratory at 8:30 a.m. and place a call to my office . . . to review your daily initiatives." (Def.'s 56.1 at ¶ 34).

5

On Friday, March 26, 2004, Plaintiff sent Employee Relations Manager Carmen Weathington an email, stating that Weathington's March 24 email to Plaintiff indicated that he should request vacation time from Genesis. (Def.'s 56.1 at ¶ 35). Also on March 26, 2004, Plaintiff visited a doctor's office, Family Medicine Specialists in Wauconda, Illinois; but he did not have an appointment, and he was not seen. (Def.'s 56.1 at ¶ 36). Plaintiff made an appointment to see a physician on March 29, 2004. (Def.'s 56.1 at ¶ 36).

On Saturday, March 28, 2004, Plaintiff sent Weathington an email, stating that "[b]ased on my doctor's recommendation, I have requested some time out. Ms. Graddy denied my request." (Def.'s 56.1 at ¶ 37). On March 29, 2004, Weathington sent Plaintiff an email, asking Plaintiff whether he had informed Graddy about his request for time off for medical reasons. (Def.'s 56.1 at ¶ 38). Plaintiff said that he did not do so. (Def.'s 56.1 at ¶ 38). March 29, 2004, Plaintiff returned to the Family Medicine Specialists in Wauconda, Illinois. (Def.'s 56.1 at ¶ 39). He saw Dr. Shervin Dorodi. (Def.'s 56.1 at ¶ 39). Plaintiff told Dr. Dorodi that he "hadn't been feeling well, that [he] was having a lot of anxiety, [he] was having chest pains, and [he] wanted to see what she thought." (Def.'s 56.1 at ¶ 39). Dr. Dorodi prescribed Paxil to the Plaintiff, which he took for a period of 1 ½ months. (Def.'s 56.1 at ¶ 40-41). Dr. Dorodi did not suggest or recommend that Plaintiff go to an emergency room or undergo an EKG or other diagnostic testing. (Def.'s 56.1 at ¶ 40). Dr. Dorodi provided the Plaintiff with a physician's slip after his visits on March 29, 2004 and April 12, 2004. (Def.'s 56.1 at ¶ 44). The Plaintiff did not provide these slips, or any other medical documentation, to anyone at Genesis. (Def.'s 56.1 at ¶ 45-46).

On March 29 and March 30, 2004, Plaintiff claims that he left Graddy voicemails, stating that he was sick, would not be working that day, and that he would need a few additional days

6

off because he was sick. (Def.'s 56.1 at ¶ 47). Plaintiff did not go to work from March 29 through April 3, 2004. On March 29, 2004, Plaintiff went to Florida for vacation with his wife and children, returning on April 5 or April 6, 2004. (Def.'s 56.1 at ¶ 49). Plaintiff was aware that his vacation request had been denied. (Def.'s 56.1 at ¶ 49).

On April 2, 2004, Graddy sent a letter to Plaintiff, terminating his employment. (Def.'s 56.1 at ¶ 50). Later in April 2004, Plaintiff met with Sharon Wagner to discuss the two grievances he had filed; the first of which concerned Graddy, and the second concerned Plaintiff's termination. (Def.'s 56.1 at ¶ 51). On May 3, 2004, Wagner sent Plaintiff a letter, upholding his termination for failure to "comply with the decision and instructions of your supervisor." (Def.'s 56.1 at ¶ 53).

Back in October or November 2003, when Plaintiff learned that Graddy was going to be his supervisor, Plaintiff met face-to-face with Sharon Wagner to discuss his concerns about Graddy's management style. (Def.'s 56.1 at ¶ 60). According to Plaintiff, Graddy was a domineering woman, aggressive, and vulgar. (Def.'s 56.1 at ¶ 61-62). Plaintiff stated that Graddy's management style included swearing at people and making belligerent comments. (Def.'s 56.1 at ¶ 61). Plaintiff claims that Wagner told him he could speak to her if Plaintiff had any issues with Graddy's treatment of him. (Def.'s 56.1 at ¶ 63). The next time that Plaintiff spoke with Sharon Wagner about concerns he had with Graddy was during a meeting with her at the beginning of 2004. (Def.'s 56.1 at ¶ 64).

7

Plaintiff states that Graddy told him that "[Graddy] and [Plaintiff] both knew that the only reason [Plaintiff] was given a client [Cavero Medical Group] was because [Plaintiff] was male" and "a good-looking man." (Def.'s 56.1 at ¶ 66). Plaintiff states that Graddy told another employee, Valerie McFerrin, that Plaintiff looked like a contestant from the television show "The Bachelor" and made a comment about wanting to see Plaintiff with his shirt off. (Def.'s 56.1 at ¶ 65).

Plaintiff filed two grievances in March 2004 about Graddy. (Def.'s 56.1 at ¶ 69). Plaintiff claims his protected activity consisted of speaking with Sharon Wagner in the fall of 2003 and January 2004 about Graddy. (Def.'s 56.1 at ¶ 72). Plaintiff does not recall whether Graddy ever told him that she knew he had gone to Wagner or whether Wagner ever told Plaintiff that she was going to tell Graddy that Plaintiff had spoken with her. (Def.'s 56.1 at ¶ 73-74). Plaintiff asserts that Graddy retaliated against him for speaking with Wagner by causing Plaintiff's final performance counseling with Pam Fletcher in March 2004 and by refusing to authorize payment of Plaintiff's commissions. (Def.'s 56.1 at ¶ 75-76).

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 (c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson*, 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

## ANALYSIS

### Discrimination Based Upon Sex

Plaintiff claims Genesis discriminated against him based upon his sex in violation of Title VII. A plaintiff may prosecute a sex discrimination claim either through the direct method – showing intentional discrimination – or indirectly through a burden-shifting method established by the Supreme Court in *McDonnell v. Douglas*, 411 U.S. 792, 800-06 (1973). Plaintiff has elected to proceed on both the direct and indirect methods. "The conventional distinction is that direct evidence is testimony by a witness about a matter within his personal knowledge and so does not require drawing an inference from the evidence (his testimony) to the proposition that it is offered to establish, whereas circumstantial evidence does require drawing inference." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). However, a plaintiff may proceed under the direct method by providing sufficient circumstantial

9

evidence as a basis for drawing an inference of intentional discrimination. *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994).

There are three categories of circumstantial evidence under the direct approach, each of which may suffice by itself to establish discrimination or may be used in combination. "The first category consists of 'suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.' The second type requires a showing that the employer systematically treated other similarly situated, [non-protected] employees better. The third type is evidence that the plaintiff was qualified for the position in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is 'unworthy of belief, a mere pretext for discrimination.' " *Venturelli v. ARC Cmty. Servs.,* 350 F.3d 592, 601 (7th Cir. 2003) (citing *Troupe,* 20 F.3d at 736). The last of these three categories is substantially the same as the evidence required under the indirect method. *Venturelli,* 350 F.3d at 601.

Plaintiff asserts that Graddy's comments are considered direct evidence of discriminatory animus and are not "stray remarks" within the meaning of *Oest v. Illinois Dep't of Corrections,* 240 F.3d 605, 611 (7th Cir. 2001) (holding that isolated comments may be discounted as stray remarks if they are merely "office banter" made by employees with no decision-making authority). Plaintiff claims his direct evidence case is supported by the following comments allegedly made by Graddy: (1) saying, in reference to Plaintiff, that she "would never let a male sales representative make more money"; (2) saying Plaintiff was only given a sales account because he was a "good-looking man"; (3) saying Plaintiff was only hired because he was a man;

10

and (4) asking Plaintiff to turn off an NCAA basketball game. As an initial matter, comments (1) and (3) are disregarded because Plaintiff failed to comply with Rule 56.1(b)(3). Plaintiff's 56(b)(3) Statement of Fact at ¶ 89(B) is supported only by Plaintiff's affidavit, and this affidavit is contradicted in pertinent part by Plaintiff's deposition testimony. "It is a well-settled rule of this [c]ourt that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition." *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532 (*Piscione*). Further, even if this evidence were admissible, these comments are not sufficient as to constitute direct evidence. As noted above, "direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus,' "*Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003), or alternatively, circumstantial evidence in the form of facts so compelling that they provide a sufficient basis for a jury to infer discrimination. *Gorence, et al. v. Eagle Food Centers, Inc.*, 242 F.3d 759, 766 (7th Cir. 2001). To be "direct evidence," the comments must have been made by a decision-maker in relation to the decisional process. Otherwise, one would have to infer that the bias reflected in the comments affected the decision. The necessity of an inference removes a comment from the realm of direct evidence. *Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 724 (7th Cir. 1998); see also *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (circumstantial evidence must "point directly to a discriminatory reason for the employer's action"). The alleged comments about Plaintiff require inferences, and none point directly to a discriminatory reason for Plaintiff's termination.

Plaintiff offers anecdotal evidence of a pattern and practice of discrimination through his own affidavit and through an affidavit filed by Josh Kramer, a former Genesis employee.

11

Plaintiff and Kramer assert that female employees were repeatedly selected for management, over more well-qualified male employees.[2] Plaintiff's reference to alleged mistreatment of other male employees cannot be considered. Rather, Plaintiff must establish that discrimination is Genesis' "standard operating procedure – the regular rather than the unusual practice." *King v. General Elec. Co.*, 960 F.3d 617 (7th Cir. 1992) (*King*). This requires a showing of "substantial proof," which means statistical evidence supported by significant anecdotal evidence. *King*, 960 F.3d at 627. Moreover, while this evidence might have some relevance, the likelihood this evidence might result in confusion and waste time substantially outweighs its limited probative value; and, thus, the evidence is excluded under Federal Rule of Evidence 403 and should not be considered at summary judgment. *See e.g., Stopka v. Alliance of American Insurers,* 1997 WL 85141, *1 (N.D. Ill. Feb. 25, 1997).

Because Plaintiff has no direct evidence that the alleged disparate treatment he suffered was based on his sex, he must, therefore, proceed under the indirect burden-shifting method of proof established by the Supreme Court in *McDonnell Douglas*, 411 U.S. 792, 800-06 (1973). *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir. 2004).

In *McDonnell Douglas*, the Supreme Court established a three-part framework governing the order and allocation of proof in cases alleging discrimination. Plaintiff relies on the indirect method and the *McDonnell Douglas* burden-shifting framework to overcome his burden on

---

[2] This directly contradicts Plaintiff's deposition testimony. During Plaintiff's deposition, Plaintiff testified as follows:

Q:    Are you aware of any female that was treated differently than you, and you believe it was due to her sex?

A:    I'm not.

(Pl. Dep. at 160). Plaintiff's affidavit to the contrary is disregarded. *Piscione,* 171 F.3d at 532.

12

summary judgment. First, Plaintiff must establish a *prima facie* case of job discrimination. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). To establish a *prima facie* case, a plaintiff must demonstrate that he was: (1) in the protected class, (2) was performing his job satisfactorily, (3) suffered an adverse employment action, and (4) was replaced by a similarly situated individual outside the protected class. *McDonnell Douglas*, 411 U.S. at 802. Once Plaintiff has established his *prima facie* case, the burden shifts to Defendant to present a legitimate, non-discriminatory reason for its decision. If Defendant presents a legitimate, non-discriminatory reason for its job decision, Plaintiff must establish that Defendant's reason was a pretext for discrimination, "an explanation designed to obscure the unlawful discriminatory employment action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002) (*Millbrook*).

Here, Defendant does not contest that Plaintiff is a member of the protected class but asserts that Plaintiff cannot meet the remaining elements of his *prima facie* case: that he was meeting legitimate job expectations, that he suffered an adverse employment action, and that other similarly situated employees outside of his protected class received favorable treatment. At a minimum, Plaintiff cannot state a *prima facie* case because he cannot establish that he was meeting legitimate job expectations. Graddy denied Plaintiff's vacation request. Plaintiff did not come to work, despite the explicit instruction by Graddy to do so. Nevertheless, Plaintiff argues that he was meeting Defendant's legitimate expectations, as evidenced by his performance reviews. This argument fails because Plaintiff's performance must be considered "at the time of his termination," which is here at issue, not his earlier performance reviews. Thus, it is undisputed that Plaintiff was not meeting Defendant's legitimate expectations. *See*

13

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) (attendance is an "essential requirement of employment").

Moreover, even if Plaintiff met his burden under *McDonnell Douglas,* the Plaintiff did not establish that Genesis' proffered reason is pretextual. The evidence submitted by the parties does not suggest that Plaintiff was discharged in April 2004 for any reason other than his insubordination; consequently, Plaintiff can provide no evidence that the proferred reason was a sham and that the true reason he was disciplined was his gender. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). Genesis' proffered reason is not factually baseless: Plaintiff went on the trip to Florida without the consent of his supervisor. Second, Plaintiff has not cast doubt that the events of March 2004 were not the "actual motivation" for his discharge. Finally, Plaintiff cannot establish that his unauthorized trip was insufficient to motivate the discharge. Consequently, Plaintiff has not met his burden of showing pretext.

Summary judgment is granted in favor of the Defendant as to Count 1 of Plaintiff's Complaint.

## *Retaliation*

To prove an employer discharged an employee in retaliation for engaging in a protected activity, the complainant must initially set forth a *prima facie* case of prohibited discrimination. *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1308-09 (7th Cir.1997) (noting the requirements for the establishment of a *prima facie* case of retaliatory discharge in violation of Title VII). To establish a *prima facie* case of retaliatory discharge, a plaintiff must establish that: (1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action

14

even though (4) he was performing his job in a satisfactory manner, unless (5) the defendant presents evidence of a reason (good or bad, provided only that it is not one that the law forbids) for the adverse action. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 642 (7th Cir. 2002).

Here, and for the same reason discussed with respect to Plaintiff's sex discrimination claim, Plaintiff cannot make out a *prima facie* case because he was not meeting his employer's legitimate job expectations. Most notably, as discussed above, Genesis presents a reason for the adverse employment action: Plaintiff's insubordination. Plaintiff's actions related to his trip to Florida more than justified Genesis' actions. Thus, summary judgment is granted to Defendant with respect to Count II of Plaintiff's Complaint.

## Breach of Contract and Violation of the Illinois Wage Payment Act

The only remaining claims are Plaintiff's state law claims for breach of contract, *quantum meruit*[3], and violation of the Illinois Wage Payment Act claims. As a general rule, "a district judge generally should relinquish pendent jurisdiction when the main claim is dismissed before trial [and] also compel[s] the conclusion that he should . . . relinquish ancillary jurisdiction when the main claim is dismissed before trial" unless there is another, independent

---

[3] During the briefing on the Motion for Summary Judgment, Genesis conceded, for purposes of summary judgment, that the sales commission plan was a contract. Plaintiff, anticipating that the Court would consider the *quantum meruit* and contract claims on their merits, sought to dismiss the *quantum meruit* claim in light of Genesis' concession, citing *Maxwell v. Vertical Networks, Inc.*, No. 03-5715, 2005 WL 950634 *9 (N.D. Ill. Mar. 18, 2005) (if the court considers the merits of a plaintiff's claim, "the [p]laintiff may no longer have the luxury of maintaining both the contract and quasi-contractual claims."). However, as Plaintiff's state law claims are remanded and this Court has not reached the merits, Plaintiff may still plead his contract and quasi-contract claims in the alternative. *Stephen L. Winternitz, Inc. v. National Bank of Monmouth*, 289 Ill.App.3d 753, 759 (Ill.App.1 Dist. 1997). Thus, the motion to dismiss the *quantum meruit* claim is denied.

basis of jurisdiction. *American Nat. Bank and Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 581

(7th Cir. 1984). Thus, Plaintiff's state law claims are remanded.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is granted.

Dated: November 21, 2006

JOHN W. DARRAH
United States District Court Judge